**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. <u>15-CR-20764</u>-Cooke

UNITED STATES OF AMERICA

v.

**CAMILO CROSS GRACIANO,**

    Defendant.
_____/

**MOTION FOR REDUCTION OF SENTENCE**
**PURSUANT TO RULE 35(b) OF THE FEDERAL RULES OF CRIMINAL**
**PROCEDURE AND TITLE 18, UNITED STATES CODE, SECTION 3553(e)**

Pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure and Title 18, United States Code, Section 3553(e), the United States of America hereby moves for a downward departure from the sentence of defendant CAMILO CROSS GRACIANO ("CROSS"), in order to reflect his substantial assistance in the prosecution of Henry De Jesus Lopez Londono and a group of traffickers who partnered with Carlos Calderon Mendoza, along with other cooperation, as discussed in more detail below. The government respectfully submits that CROSS should receive a 40 percent reduction in his sentence, which also takes into account that CROSS has not satisfied his forfeiture money judgment, specifically to 126 months' incarceration. In support of this motion, the government states the following:

**I.     BACKGROUND**

1.     CROSS was charged and pled guilty to participating in a cocaine distribution conspiracy, in violation of Title 21, United States Code, Section 963, after he was extradited from Colombia. He was sentenced by Your Honor to 210 months' incarceration, which was below the bottom of the range (262 months' incarceration) applicable to him under the United States

Sentencing Guidelines ("Guidelines"). He is presently scheduled to complete that sentence in July 2031.

2.  As was discussed in the Presentence Investigation Report ("PSI"), CROSS was an investor in and organizer of cocaine loads sent north from Colombia. In that role, he supervised others who aggregated cocaine, dispatched it from Colombia and coordinated the receipt of the cocaine in Central America and Mexico. In or about the spring of 2013, CROSS and his co-conspirators dispatched a go-fast boat from the coast of Colombia to Honduras containing approximately 650 kilograms of cocaine. This load was successfully delivered in Honduras and, during the course of the shipment, CROSS communicated with co-conspirators via Blackberry messages to have money sent from Mexico to Colombia to fund the cocaine purchase. Following that successful shipment, the co-conspirator group prepared to send another load via the same route, with the boat now intended to contain approximately 1,750 kilograms of cocaine. This load was also successfully delivered in Honduras and then began being transported further north. However, once the cocaine moved into Guatemala, in October 2013, law enforcement monitoring the communications of the co-conspirators were able to seize a portion of the load, namely 975 kilograms.

3.  In his plea agreement, CROSS stipulated that he should be held responsible for trafficking 10,000 kilograms of cocaine. He also agreed that he was a manager or supervisor of the trafficking activity. Finally, at sentencing, he agreed to forfeit $250,000, which amount represented part of his earnings from the unlawful activity.

II.  **THE DEFENDANT'S COOPERATION**

4.  CROSS was arrested in Colombia and extradited to this District. He was the second of the four co-defendants named in the Indictment to arrive in Miami, Florida, and, upon

his arrival, he indicated a desire to cooperate. To that end, prior to the government providing him any discovery, CROSS attended a meeting with the government and admitted to his participation in the narcotics conspiracy. Notably, CROSS did not make the decision to cooperate after reviewing all of the evidence against him and deciding that he had no option other than to plead guilty and cooperate – and this early acceptance of responsibility by CROSS was among the reasons the Court cited for sentencing CROSS below the Guidelines range applicable to him.

5. During debriefs where he discussed his conduct with narcotics co-conspirators, CROSS mentioned an individual named Henry De Jesus Lopez Londono, also known as "Mi Sangre," who was poised to proceed to trial in this District. *See generally United States v. Lopez Londono*, 10-CR-20763-Graham (S.D.F.L.). CROSS was interviewed by agents about his knowledge of and interactions with Lopez Londono, and it was determined that CROSS's potential testimony would be useful at trial. To that end, CROSS was among those publicly listed on the court docket to be witnesses at trial, which trial occurred over February and March of 2018.

6. It should be noted that Lopez Londono was a very significant and violent narcotics trafficker. At trial, multiple co-conspirators testified regarding their dealings with Lopez Londono in the trafficking of cocaine to the United States that occurred during the charged conspiracy—October 2006 through February 2012. Leading up to the conspiracy, in the early 2000s in Colombia, Lopez Londono joined the United Self-Defense Forces of Colombia (known in Spanish by the acronym "AUC"), an organization designated in 2001 by the United States a foreign terrorist organization. The AUC used drug proceeds to fund criminal and terrorist activities in Colombia. Lopez Londono ascended through the ranks of the AUC to control areas in and around Bogota, Colombia, known as the Bloque Capital, where he trafficked in narcotics and collected drug debts for the organization.

7. After the AUC demobilized in or around 2005 pursuant to a peace treaty with the Government of Colombia, former members of the AUC formed into criminal organizations throughout Colombia to control highly-profitable drug trafficking routes. Lopez Londono joined the Urabeños criminal organization (sometimes referred to as "Clan Usuga" or "Clan de Golfo") situated along the northern coast of Colombia. He became a high-ranking leader of the Clan de Golfo ("CDG"), managing drug trafficking activities of the organization.

8. During the conspiracy, from the areas controlled by Lopez Londono and the CDG, drug traffickers sent boats loaded with thousands of kilograms of cocaine to Central America for eventual importation into the United States. The evidence at trial showed that Lopez Londono: (1) taxed drug traffickers approximately $400 to $500 per kilogram of cocaine leaving Colombia from areas he and his organization controlled; (2) he invested kilograms of cocaine in loads dispatched by drug traffickers; and (3) he collected drug debts, which at times involved violence or threats of violence.

9. Witnesses testified that, working with Lopez Londono, they sent approximately 60,000 kilograms of cocaine from Colombia to Central America for eventual importation into the United States. Regarding drug debts, when law enforcement seized a drug load or a load was somehow lost, a debt resulted between the person responsible for losing the load and the trafficker who invested money in the venture. The trafficker who lost his investment contracted Lopez Londono and his organization to collect the debt. Lopez Londono received a percentage of the debt collected. To collect the debt, one of the tactics used was that Lopez Londono and his workers kidnapped the debtor until he paid the debt and if no payment occurred, Lopez Londono and his organization sometimes resorted to murdering the individual. Payments received from debt collections permitted Lopez Londono's criminal enterprise to flourish, for example, by using

the funds to pay workers that aided him in controlling his drug trafficking areas of operation, and to further additional drug trafficking ventures. This led Lopez Londono to eventually lead a group that consisted of 900 men under his control.

10. Beyond the position of Lopez Londono as significant and violent drug trafficker, it should be noted that the trial presented challenges for the government because Lopez Londono claimed a "public authority" defense, arguing that his drug trafficking work was done at the behest of DEA. Indeed, it was true that Lopez Londono had at one time or another communicated with various members of U.S. law enforcement while he considered cooperating or surrendering. However, the trial team proved that at no time was Lopez Londono ever considered a cooperator by law enforcement and he was never granted permission to traffic drugs, much less to commit acts of violence. Due to the fact that Lopez Londono was a prominent and violent trafficker, coupled with his purported defense, the trial against him was one of importance for the government.

11. Despite the significance of Lopez Londono as the head of a large, drug trafficking organization and his known propensity for violence, CROSS agreed to testify against him at trial. Therefore, the government listed him on the docket as an expected trial witness. However, the government, for strategic reasons, originally decided to utilize CROSS as a rebuttal witness, rather than having him testify during the government's case-in-chief, and then later decided not to call him during rebuttal – again for strategic reasons. The government's strategy succeeded and Lopez Londono was convicted. He was sentenced to 31 years' incarceration. Though CROSS did not testify, the government respectfully submits that his cooperation, expected testimony, and availability as a publicly-named witness assisted the government in convicting Lopez Londono. Thus, in considering the appropriate sentence for CROSS, the government respectfully submits

that the Court should credit CROSS for the assistance he provided in the *Lopez Londono* prosecution.

12.     CROSS also provided information about Carlos Calderon Mendoza ("Calderon"), 17-CR-20563-DPG, and his group, who trafficked under the umbrella of the CDG. This group of traffickers invested in multi-hundred kilogram loads of cocaine that were shipped north from Colombia, arranged for the transport from Colombia, paid bribes to law enforcement officials in Colombia to allow the loads to be sent out, and paid taxes to the CDG as part of that same arrangement allowing the group to operate. Information provided by CROSS, along with other evidence including telephone and text message intercepts, video recordings, and seizures of several hundred kilograms of cocaine and an airplane, allowed the government to charge Calderon and several other of his co-conspirators. CROSS stood ready and willing to be a witness against Calderon, but such assistance was not necessary because, after he was arrested, he indicated a desire to plead guilty. Calderon was sentenced to 144 months' incarceration and has since perished in prison.

13.     It should also be noted that CROSS provided information about other co-conspirators and his debriefs as to those individuals were useful to the government as intelligence, as well as to further investigative leads. While that other information that CROSS provided was not used for charges, arrests or convictions, it was nonetheless helpful to law enforcement. Thus, the government respectfully submits that the Court should consider that additional information in determining the appropriate reduction for CROSS and the government's request for a 40 percent reduction aims to give credit to CROSS for all the information that he has discussed with the government, as well as all the intelligence he has provided, effectively affording him a reduction for all the cooperation to date.

### III.   CONCLUSION AND THE PARTIES' POSITIONS AND RECOMMENDATIONS

14. The government is willing to further elaborate on the nature and quality of this assistance at a hearing on the motion, if the Court so desires. However, the parties are in agreement that CROSS's substantial assistance merits a sentence reduction.

15. Based on his cooperation, albeit taking into account that CROSS has not satisfied the forfeiture money judgment, the United States believes that CROSS's sentence should be reduced by 40 percent of his sentence, specifically to 126 months' incarceration.

16. The defendant, while agreeing that a reduction is appropriate, wants the opportunity to argue for an even lower sentence and thus requests a hearing on a date on or after January 4, 2022, as convenient for the Court. The defendant also requests to be present for the hearing in January 2022.

    Respectfully submitted,

    JUAN ANTONIO GONZALEZ
    UNITED STATES ATTORNEY

By:   /s/
    WALTER M. NORKIN
    Assistant United States Attorney
    Court ID No. A5502189
    99 NE 4th Street, Room 718
    Miami, Florida 33132-2111
    Tel: (305) 961-9406

## CERTIFICATE OF SERVICE

      I hereby certify that on or about December 9, 2021, the undersigned filed the foregoing document with the Clerk of the Court and served a copy upon defense counsel of record via email on or about that same date.

                                      /s/ Walter M. Norkin
                                      Walter M. Norkin
                                      Assistant United States Attorney